## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CYNTHIA FULLER,

        Plaintiff,

    v.

DENIS MCDONOUGH, United States
Secretary of Veterans Affairs,

        Defendant.

No. 19 CV 1325

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiff Cynthia Fuller worked for the Department of Veterans Affairs for eleven years. Another employee (who was romantically involved with one of Fuller's supervisors) made lewd remarks to Fuller, and she complained. Fuller's supervisors began closely scrutinizing her conduct, which affected Fuller's mental health. Related workplace stress led Fuller to ask for an accommodation for mental health disabilities, but the VA didn't accommodate Fuller in the way she wanted. Citing various instances of misconduct, the agency disciplined Fuller and ultimately terminated her employment. Fuller brings claims under Title VII, the Rehabilitation Act, and the Age Discrimination in Employment Act. Both parties move for summary judgment. For the reasons that follow, the VA's motion is granted, and Fuller's motion is denied.

## I. Legal Standards

A party moving for summary judgment must show that there is no genuine dispute about any material fact and that they are entitled to judgment as a matter of

law. Fed. R. Civ. P. 56. The moving party must demonstrate that, after construing all facts and drawing all reasonable inferences in favor of the nonmovant, a reasonable jury could not return a verdict for the nonmoving party. *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Or the moving party must show that the nonmoving party has failed to establish an essential element of their case and could not carry their burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). I need only consider the cited materials, but I may consider "other materials in the record." Fed. R. Civ. P. 56(c)(3). These standards apply equally to cross-motions for summary judgment, *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017), and I consider evidence from both motions to ensure that there is no material dispute. *Torry v. City of Chicago*, 932 F.3d 579, 584 (7th Cir. 2019).

## II.    Facts

Beginning in 2006, Cynthia Fuller worked as a medical instrument technician at the Jesse Brown VA Medical Center. *See* [76] ¶ 1; [81] ¶ 1; [82] ¶ 1.[1] Fuller's

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. In the case of citations to depositions, I also include the deposition transcript's original page number. The facts are taken from Fuller's response to the VA's Local Rule 56.1 statement, [76], and from the VA's response to Fuller's Rule 56.1 statements, [81]; [82], where both the asserted fact and the opposing party's response are set forth in one document. Any fact not properly controverted is admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). I disregard legal arguments in the statements of facts, *see Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006), and ignore additional facts included in response to the asserted fact that do not controvert the asserted fact. N.D. Ill. Local R. 56.1(e)(2). Plaintiff fails to properly controvert many of defendant's statement of facts, which are admitted. *See* [76] ¶¶ 13–14, 17, 21–24, 26–29, 31–34, 38–39, 45, 48, 56, 58, 60–63, 65–66, 70–74, 77. The additional facts that do not controvert the asserted facts, the argumentative statements, and

primary responsibility was to assist physicians during endoscopies and colonoscopies: stocking the procedure room with sterile instruments, handing equipment to physicians, and cleaning up. [76] ¶ 7; *see* [82] ¶ 1. Fuller's work also required her to interact with patients. [76] ¶ 7. Performance evaluations showed that Fuller was rated fully successful, excellent, or outstanding for much of the period between 2006 and 2016. *See* [81] ¶ 1; [76-2] at 2–64.[2]

## A.   Harassment

Sometime in fall 2016, Vincent Saulsberry, a VA employee who worked in a different department than Fuller, approached her and said he wanted to engage in a sex act with Fuller. [76] ¶ 44; [81] ¶ 2.[3] Saulsberry made a second comment with similar coarse language to Fuller in June 2017. [76] ¶ 46; [81] ¶ 22. Fuller said that in September or fall of 2017 she told her union representative about the comments and reported Saulsberry's conduct to the nurse executive, HR, an Equal Employment Opportunity counselor, and the medical center's associate director. [76] ¶¶ 5, 48; [64-

---

[2] The VA evaluated Fuller using a five-level rating scale: unacceptable, minimally satisfactory, fully successful, excellent, and outstanding. *See* [76-2] at 2–65. The agency considered Fuller's performance in several areas, including (1) technical competence; (2) patient care; (3) customer service and interpersonal relationships; and (4) patient and environmental safety. *See id*. Fuller's performance evaluations from 2006–2016 include praise for her professionalism and competence. *See, e.g.*, [76-2] at 10.

Those unsupported by the record—all of which are ignored—are found at [76] ¶¶ 11–12, 32, 36, 38–39, 45, 48, 53, 59, 61–63, 65; [81] ¶¶ 3–4, 6, 27, 32–33, 53, 55, 58–59, 72; [82] ¶ 22.

[3] Fuller could not remember the month when Saulsberry made his initial comment. *See* [64-2] at 18, Dep. at 63–65. Fuller said that the incident occurred in "the fall of 2016." *Id*. at 18, Dep. at 65.

2] at 18–19, 27–28, Dep. at 64–69, 100–102; *see* [81] ¶ 3.[4] Fuller's union representative said that she and Fuller went to HR to file a complaint "maybe" seven-to-nine months before Fuller was removed from her position, meaning between February and April 2017. *See* [81] ¶ 3; [76-2] at 541–42, Dep. at 52–57.[5] Fuller sent the union representative a report about Saulsberry's comments, and the union representative forwarded that report to the medical center's HR department in September 2017. [76] ¶ 49. The chief nursing officer said that she received a report about Saulsberry's comments and shared that complaint with other VA employees, but couldn't remember when she received the report. *See* [81] ¶ 3; [76] ¶ 4; [76-2] at 177–78, Dep. at 20–22.

Saulsberry was in a romantic relationship with the associate chief nurse of outpatient and emergency services, Dana Beatty. *See* [76] ¶¶ 3, 51; [81] ¶ 2. Beatty

---

[4] Fuller asserts that she complained about Saulsberry's conduct shortly after the incident, *see* [81] ¶ 3, but that statement of fact isn't supported by the record. I disregard the cited portion of Fuller's affidavit (made in March 2022) because it conflicts with Fuller's deposition testimony (taken in February 2020). *See James v. Hale*, 959 F.3d 307, 315–16 (7th Cir. 2020) (citations omitted) (judges may disregard "sham" affidavits—meaning affidavits that contradict earlier deposition testimony); *compare* [64-2] at 18–19, 27–28, Dep. at 64–69, 100–102 (Fuller said in her deposition that she reported Saulsberry's comment to HR, EEO, the medical center's associate director, and Fuller's union representative in fall or September 2017) *with* [76-2] at 165, ¶¶ 7–10 (in her declaration, Fuller said that she told her union representative "shortly after" Saulsberry's comment in fall of 2016 and then Fuller and the union representative reported the incident to management). The union representative's declaration has the same problem. At her deposition, taken in October 2020, the representative couldn't recall the precise date that she and Fuller reported Saulsberry's conduct to HR, and said that it might have been between seven and nine months before Fuller was removed. *See* [76-2] at 541–42, Dep. at 52–57. In a subsequent declaration, however, the representative said that she "took [Fuller] to complain to Jesse Brown leadership right after [Fuller] told [the representative]" about Saulsberry's comment, "sometime before November 2016." [76-2] at 169, ¶¶ 7–9. I disregard this portion of the declaration because it conflicts with the union representative's earlier deposition testimony. *See James*, 959 F.3d at 315–16.

[5] Fuller was removed from her position in November 2017. *See* [76] ¶¶ 42–43; [81] ¶ 69.

supervised Fuller's direct supervisor, Kelli Goshay. [82] ¶¶ 5–6; [76] ¶¶ 2–3. Fuller said that at some point after Saulsberry made comments to Fuller, Beatty began to scrutinize and harass her because Saulsberry was Beatty's boyfriend. [76] ¶¶ 50–51; [81] ¶ 6. Goshay said that Beatty was focused on Fuller as of November 2016, and that Beatty would ask Goshay for updates on discipline about Fuller but not about other employees. *See* [81] ¶ 7. Goshay said that Beatty wanted Fuller disciplined, that Beatty wanted Goshay to send disciplinary material about Fuller to Beatty's personal email address because of the situation with Saulsberry, and that Beatty asked Goshay to hide Beatty's involvement from any EEOC investigations. *See* [81] ¶ 8. Fuller believed that Goshay was targeting her for discipline at Beatty's direction. *Id.* ¶ 6. Fuller's union representative heard Goshay ask an employee to document misconduct by Fuller, and Goshay told the union representative that she needed to do what Beatty told her. *Id.* ¶ 12.

Fuller requested a transfer to a different department in March 2017, but Beatty denied her request because there were no open positions. *See* [81] ¶ 4; [76-2] at 220. Fuller said that the situation with Beatty and Goshay damaged her mental health. [81] ¶ 6. In 2019, the VA began an investigation into Beatty's conduct. *Id.* ¶ 45. A year later, Beatty was removed from her position because she created a hostile work environment and intimidated other employees. *Id.* ¶ 45.

### B. Requests for an Accommodation

Fuller began treatment for adjustment disorder, anxiety, and depressed mood in 2016. [81] ¶ 48. In September of that year, Fuller requested an accommodation

from the VA, and her psychologist completed a VA form providing medical documentation. [76-3] at 536–37; *see* [81] ¶ 48.[6] Fuller's psychologist recommended that Fuller receive four weeks away from work. [76-3] at 536–37; *see* [81] ¶ 48. In August 2017, Fuller told her psychologist that she had difficulty sleeping and that her primary care doctor had prescribed medication to treat anxiety and insomnia. [76-3] at 541; *see* [81] ¶ 48. Fuller said that she had trouble concentrating and felt restless half of the time during the past two weeks. [76-3] at 541; [81] ¶ 48. Fuller also told her doctor that she was experiencing acute stress because her superiors at work were purposefully mistreating her. [76-3] at 546; [81] ¶ 48. Fuller's psychologist diagnosed her with anxiety and major depressive disorders. [81] ¶ 48; [76-3] at 544.

On July 19, 2017, Fuller reported to her supervisor that a conflict with a coworker was causing her stress. [81] ¶ 24; [76-2] at 706. Three weeks later, Goshay wrote a letter to Fuller acknowledging that Fuller was experiencing stress. [81] ¶ 25. Goshay suggested that Fuller take advantage of certain resources, including the VA's reasonable accommodation procedure. *Id.* Goshay said that she received documents showing that Fuller could be a danger to herself or others. *Id.*

Fuller submitted a written request for an accommodation on August 28, 2017, asking that the VA transfer her out of nursing service because of her conditions. [76] ¶ 53. The VA's accommodation coordinator met with Fuller and Fuller's union

---

[6] It's reasonable to infer that Fuller requested an accommodation in September 2016. The VA form that Fuller's doctor completed says that Fuller "has requested an accommodation." [76-3] at 536. It's not clear, however, whether Fuller returned the form to the VA, and the VA form says that the agency could not proceed with the request until it received medical documentation. *See id.* Fuller said that she first asked for a reasonable accommodation in August 2017. *See* [64-2] at 31, Dep. at 114.

representative on August 28, and asked Fuller to have her doctor complete a form to support her request. *Id.* ¶¶ 55–56. On the VA's form, Fuller's doctor wrote that a severe, acute medical illness required Fuller's immediate removal from her current environment, and that Fuller needed to be moved "out of [the] nursing service department." [76-3] at 4; *see* [76] ¶ 57; [81] ¶ 29. Fuller's doctor noted that her conditions didn't impair specific activities, but also that Fuller couldn't function and perform assigned duties in her current work environment. [76-3] at 5; [76] ¶ 57. The doctor wrote that Fuller required time off for a few days, and the VA complied with that request. [76] ¶ 57. Medical records showed that Fuller was being treated for work-related stress and related mood symptoms. *See* [81] ¶ 27; [76-2] at 754, 756.

On September 11, 2017, the medical center's nurse executive emailed the accommodation coordinator, expressing concern that the agency hadn't moved fast enough on Fuller's request. [81] ¶¶ 46, 49–51.[7] The VA's accommodation coordinator believed that Fuller's documentation supporting her request was incomplete because it didn't explain Fuller's limitations. [76] ¶¶ 58–59.[8] Another VA staff member also wasn't sure what accommodation Fuller needed, if any. *See* [76] ¶¶ 61–62; [64-3] at

---

[7] The accommodation coordinator said that an interim accommodation could be provided to VA employees in certain circumstances. [76-3] at 19, Dep. at 46. According to a VA handbook, if an accommodation could not be provided immediately, "an interim accommodation should be provided when feasible," but wasn't guaranteed. [76-2] at 729; [81] ¶ 27.

[8] The coordinator also said that Fuller and her doctor had provided information about her depression, that depression is a disability, and that he reported Fuller's conditions to Fuller's supervisors. [81] ¶ 28; [76-3] at 33–34, Dep. at 105–12. The coordinator acknowledged that the VA doesn't require medical records to process some reasonable accommodation requests, but said that he requested documentation in Fuller's case because her request wasn't clear. *See* [81] ¶ 28; [76-3] at 34, Dep. at 105–09.

41–43. The coordinator asked that Fuller give him permission to get more information directly from Fuller's doctors, but Fuller didn't complete the authorization paperwork. [76] ¶ 60.

VA officials decided to transfer Fuller to a different part of the medical center—sterile processing services—where Fuller would work under a different supervisor. [76] ¶ 63. But after Fuller was reported for violating the protocol for scope sterilization (as discussed below at 11–12), on September 12, 2017, the nurse executive temporarily reassigned Fuller to volunteer services instead. *Id*. ¶ 64; [81] ¶ 60.[9] After the transfer, Fuller told her psychologist that "her work stress has significantly decreased since being moved" and that she was "experiencing 'peace' since being removed from her stressful work environment." [64-3] at 50–51; [76] ¶ 66. Fuller told the management official involved with her transfer that volunteer services was "ok" and that she liked it there. [64-3] at 46; *see* [76] ¶ 66.[10] Emails and a meeting

---

[9] The accommodations coordinator wrote that the nurse executive terminated Fuller's reasonable accommodation process. [76-3] at 556; *see* [81] ¶ 53. The nurse executive couldn't identify any documents that showed that Fuller's move to volunteer services was based on her reasonable accommodation request. [81] ¶ 60. The management official assigned to Fuller's request gave Fuller a temporary reassignment letter and said that while she was going to provide a reasonable accommodation, the incident involving scope sterilization had changed the agency's plan. *See* [76-3] at 277–78; [81] ¶ 72. The record cited doesn't support the proposition that the designated management official told Fuller and her union representative that the move to volunteer services "was not related" to Fuller's accommodation request. *See* [81] ¶ 72; [76-3] at 277–78. The management official wrote in an email that the move to volunteer services had "eliminated the need to provide" an interim accommodation to Fuller. [76-3] at 608.

[10] Fuller's union representative said that Goshay maintained some control over Fuller's employment even after Fuller was moved to volunteer services. [76-2] at 570, Dep. at 167. The union representative also said that the medical center unit where Fuller was transferred was still part of the nursing service. [81] ¶ 72; [76-2] at 568, Dep. at 161. It's reasonable to infer that the union representative—charged with filing grievances on behalf of hospital

report from November 2017 show that VA officials continued to discuss how to accommodate Fuller's request for an accommodation. *See* [81] ¶ 73; [76] ¶ 62; [76-3] at 610; [64-3] at 45–46.

### C.    Discipline and Removal

In late August 2016, during the time when Fuller was being treated for anxiety and depression, a patient sent a letter to the Medical Center's leadership complaining about how Fuller had treated him. *See* [76] ¶ 10; [64-2] at 232–234. As a result, Fuller's supervisor issued her an admonishment for unprofessional and inappropriate conduct, which was later reduced to a written letter of counseling. [76] ¶¶ 11–12.

Fuller was involved in a workplace dispute with a coworker in January 2017. [76] ¶ 13; *see* [81] ¶ 14. A nurse said that she found Fuller asleep at a desk. [76] ¶ 13. While attempting to retrieve something from the desk, the nurse startled Fuller awake, and Fuller called her coworker a name. *Id*. Fuller contacted Goshay about the incident and filed a report with the VA police. [81] ¶ 14. Both Fuller and the other employee were investigated for inappropriate behavior, and Fuller denied sleeping on the job. [81] ¶¶ 15–16. Fuller received a related letter of reprimand for inappropriate conduct on March 28, 2017. [76] ¶ 14; *see* [64-2] at 241–42.[11] Some two

employees—had personal knowledge of the institutional structure at the medical center. *See* [76-2] at 19–29.

[11] Fuller denied that she fell asleep on the job, *see* [76-2] at 691, but that doesn't controvert the fact that she received the letter of reprimand. *See* [76] ¶ 14. The letter said that Fuller's inappropriate conduct was (1) being found half-asleep in the nurse's station and (2) calling a coworker a name. [64-2] at 241. When discussing potential discipline for Fuller, Goshay didn't disclose to an HR specialist that Beatty was pressuring her to discipline Fuller and wrote that Fuller "had been the source of multiple issues" in the past. [81] ¶ 18; [76-2] at 685. While Goshay had a choice between an admonishment or a reprimand, she recommended that

9

weeks later, however, Goshay rated Fuller as fully successful on a midterm progress review. [81] ¶ 5.

In June 2017 a nurse reported that Fuller had failed to prepare a procedure room, causing a delay. [76] ¶ 17. The nurse also said that Fuller had been rude and intimidating. *Id.* Fuller said that she didn't know anything about the incident, but two other department employees confirmed that a procedure had been delayed. *Id.*; *see* [64-2] at 196, 205. When Goshay later met with Fuller, Fuller said she couldn't remember where she was working on the day in question, and didn't remember the incident. [76] ¶ 17; *see* [64-2] at 189–192.[12]

A month later, Goshay saw Fuller have a disagreement with a coworker while a patient was present. [76] ¶ 18. Goshay then had a conversation with Fuller. *Id.* Goshay later reported that Fuller was loud and interrupted, and other employees also wrote reports describing the incident. *Id.*; *see* [64-2] at 184–87.[13] At a meeting with Goshay, Fuller denied that any disagreement had taken place. [76] ¶ 18.

---

Fuller receive the harsher penalty of a reprimand. [81] ¶ 20. The chief of the nursing service officially issued the reprimand to Fuller. *See id.*; [64-2] at 241–42.

[12] Fuller said that Beatty manipulated the timing of the investigation into this incident so as to ensure that Goshay investigated Fuller. [81] ¶ 23; [64-2] at 28, Dep. at 104. Fuller had personal knowledge of the timing of the investigation but was speculating as to Beatty's motivations behind the decision to delay the investigation. Her speculation is inadmissible. *See* Fed. R. Evid. 602.

[13] Plaintiff argues that because the identity of the VA employees who filed reports about the incident aren't clear from the reports themselves, the reports don't support defendant's statement of fact. *See* [76] ¶ 18. But these business records are admissible evidence at this point in the case because it's reasonable to infer from the contents of the reports that they were made by people with knowledge of the events. *See* Fed. R. Evid. 803(6). That the identity of the authors isn't clear from the reports goes to the reliability of this evidence— to its weight—rather than to its admissibility. See *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008) (at summary judgment a court's role is not to evaluate the weight of evidence).

As part of her work, Fuller was responsible for retrieving clean scopes for use in medical procedures. [76] ¶ 29; *see* [64-2] at 39, Dep. at 146. Standard protocol required that scopes be sterilized, and that nurses use tags (with an expiration date) to indicate that scopes weren't in need of reprocessing. *See* [76] ¶¶ 21–27, 29. Goshay said that she provided training on the procedure to Fuller and other staff, and that the sterilization policy had been in place before November 2016. *Id.* ¶ 28.[14] Fuller verified in February 2017 that she knew about the tagging procedure for scopes, *id.* ¶ 26, but later said that she had never been trained on the process and that nurses regularly used untagged scopes. *See id.* ¶¶ 34; [81] ¶ 33; [76-3] at 599. Another technician said that he wasn't trained to follow all aspects of the tagging procedure, either. *See* [76] ¶ 29; [81] ¶ 33; [76-3] at 280–81.

On September 12, 2017 (two weeks after Fuller submitted a written request for an accommodation), a nurse told Goshay that during a procedure she asked Fuller for a tag confirming the cleanliness of a scope, but Fuller said that the scopes didn't have tags. [76] ¶¶ 32, 53; [64-2] at 103–04, Dep. at 124–131; [64-2] at 162; [64-2] at 149, ¶¶ 16–17.[15] The nurse later found expired scope tags in the garbage, suggesting that the scopes used in the procedure may not have been sterile at the time of the procedure. *See* [76] ¶ 32; [64-2] at 162. In a second procedure the same day, Fuller

---

[14] Goshay couldn't say what the regular scope sterilization *practice* at the medical center was before she was hired, [76-2] at 130, Dep. at 251; *see* [81] ¶ 33, but that doesn't controvert defendant's asserted fact: that the policy was in place before to Goshay's arrival. *See* [76] ¶ 28.

[15] The materials cited—Goshay's deposition testimony, declaration, and a report about the incident from the nurse—adequately support defendant's statement of fact. I ignore plaintiff's response, which is argumentative and fails to controvert the fact asserted.

reported to another nurse that a scope had no tag. [76] ¶ 33. Goshay reviewed records for the past month and found that four department employees (including Fuller) had provided scopes with expired tags during procedures. *Id.* ¶ 35. The three other nurses who provided expired scopes during procedures didn't have earlier disciplinary records in their files at the time, the scopes-related conduct didn't impact their performance evaluations, and they weren't disciplined. [76] ¶ 38; [81] ¶¶ 39, 56–58. Following the instructions of the VA's HR office and leadership, Goshay didn't discipline two of the other nurses for using untagged scopes and falsifying related records. [81] ¶¶ 34–36.[16]

About a month later, the medical center's nurse executive issued Fuller a notice of proposed removal. [76] ¶ 39; [82] ¶¶ 4, 7; [81] ¶ 55.[17] The notice explained that Fuller's proposed removal was based on her (1) failure to follow standard operating procedure related to scopes; (2) failure to carry out assigned work, causing a delay in patient care; and (3) conduct unbecoming a federal employee. [76] ¶ 39; *see* [64-2] at 152–155.[18] In an email to another employee, Goshay wrote that the nurse

---

[16] Plaintiff hasn't shown that Fuller's union representative had personal knowledge about the scope sterilization procedures at the medical center after Fuller was issued a notice of proposed removal. *See* [81] ¶ 59; [76-2] at 570, Dep. at 167–69; Fed. R. Evid. 602. It's not clear, based on the representative's deposition testimony, either how she knew what procedures were being followed at the medical center for scope sterilization or that her testimony about photographs of scopes referred to the period after Fuller was issued the notice of proposed removal. *See* [76-2] at 570, Dep. at 167–69.

[17] Goshay said that she gathered disciplinary evidence about Fuller and sent it to HR in anticipation of further disciplinary action, including Fuller's proposed removal. *See* [76] ¶ 19; [64-2] at 102, Dep. at 83–85. The HR employee's statement to Goshay about Fuller's conduct, if offered for the truth, is inadmissible hearsay. *See* Fed. R. Evid. 802.

[18] The notice also referenced Fuller's earlier reprimand and admonishment. [76] ¶ 39; [64-2] at 153. The notice did not explain that the admonishment had been reduced to counseling.

executive wanted Fuller's removal "rushed." [81] ¶ 54; [76-3] at 559. Later, the nurse executive said he couldn't remember who drafted the notice of proposed removal, where some of the facts supporting the removal came from, or why he had been the one proposing the removal, rather than someone else at the VA. [81] ¶ 55; [76-3] at 297, 300, Dep. at 57, 68. On November 2, the medical center's director met with Fuller and her union representative to hear Fuller's reply to the proposed removal. [76] ¶¶ 6, 41; [82] ¶¶ 2, 8; [81] ¶ 62. Two weeks later, the director wrote Fuller a letter firing her from her position, but also sent Fuller a last chance agreement. [76] ¶ 42; [64-2] at 286–89, 291–94; *see* [82] ¶¶ 9–10.

The VA offered Fuller the last chance agreement because of Fuller's years of service with the agency. *See* [76] ¶ 42; [64-2] at 286–89, 291–94. Last chance agreements were generally used if a decisionmaker believed that an employee shouldn't be terminated from their employment for one reason or another. [82] ¶ 14; [81] ¶ 64.[19] In the last chance agreement offered to Fuller, the VA promised to "hold

---

*See* [64-2] at 153. That Goshay prompted another employee to include the admonishment, *see* [76-3] at 275, doesn't controvert defendant's asserted fact, or support the proposition that Goshay and the VA's HR office intentionally misrepresented Fuller's letter of counseling. *See* [81] ¶ 32. Fuller was given the notice of proposed removal even though she had never been suspended. *See* [81] ¶ 32. A VA handbook said that progressive discipline was "a commonly recognized principle," but didn't prohibit the agency from skipping disciplinary steps. *See* [76-3] at 110; [81] ¶ 32. The agency's subsequent removal decision letter didn't mention the admonishment or counseling. *See* [64-2] at 286–289. The VA's handbook included a requirement that employees be given a reasonable opportunity to improve before removal, [81] ¶ 40, but that policy applied to performance-based removals and Fuller was removed for disciplinary reasons. *See* [76-3] at 340–44; [64-2] at 152–54, 286–89.

[19] The director said that only he had the authority to offer a last chance agreement to an employee, and that the removal decision would be held in abeyance pending the employee's decision as to the last chance agreement. *See* [73-1] at 106–07, Dep. at 78, 82–83; *see* [81] ¶ 63; [82] ¶ 13.

the penalty of removal in abeyance for a period of twenty-four (24) months" in exchange for various promises from Fuller. *See* [73-2] at 128–30; [82] ¶ 17. The last chance agreement required Fuller to

> waiv[e] all appeal and grievance rights arising from this agreement or any other violation of the terms of this agreement including, but not limited to, the use of the Equal Employment Opportunity discrimination complaints procedure, use of the negotiated grievance/arbitration procedure, use of the Merit Systems Protection Board procedure, and civil court appeal.

[73-2] at 128–29; *see* [82] ¶ 17; [81] ¶ 66. The agreement also required Fuller to waive her rights to appeal, and to recognize that "this agreement is a final and binding resolution to her removal from employment" with the medical center. [73-2] at 129; [82] ¶ 17; [81] ¶ 66. The last chance agreement said that Fuller promised to "voluntarily withdraw any other action, proceeding, complaint, etc., which may be pending against the Agency" or its officers and employees. [73-2] at 131; [82] ¶ 17; [81] ¶ 66.

In a letter, Fuller rejected the last chance agreement because (1) she refused to waive her right to "prosecute any existing or future claims against the Agency" or her right to use EEO complaints procedures; (2) the last chance agreement didn't guarantee that Fuller would be treated the same as other employees as to discipline or termination; and (3) even absent an express waiver of her appeal rights, the last chance agreement effectively waived Fuller's rights to certain complaints procedures and to pursue litigation against the agency. [64-2] at 296–97; *see* [76] ¶ 43; [82] ¶ 18; [81] ¶ 67. Fuller presented her letter to the chief nursing officer on November 20, and said that she would not sign the last chance agreement unless the agency removed

14

the requirement that Fuller waive her EEO rights. *See* [76] ¶ 4; [81] ¶ 68; [82] ¶ 19; [76-2] at 164–65, ¶ 4.[20] Shortly after that meeting, the chief nursing officer told Fuller that because she refused to execute the last chance agreement, her employment was terminated. [81] ¶ 69; [82] ¶¶ 20–21; [76] ¶ 43; *see* [64-2] at 289. According to the medical center's director, had Fuller signed the last chance agreement and complied with its terms, she would not have been terminated. [82] ¶ 15; [81] ¶ 65.

### D.  EEO Complaint and Investigation

Fuller began pre-complaint counseling with the Equal Employment Opportunity Commission on November 16, 2017, and complained of discrimination on the basis of disability and race, sexual harassment, and retaliation. [76] ¶ 68; [81] ¶ 37; *see* [64-3] at 53–55. Two months later, Fuller filed a formal complaint with the VA's Office of Resolution Management, alleging discrimination and retaliation. [76] ¶ 68; [64-3] at 57–60. The EEOC investigated the complaint but found no discrimination. *See* [64-3] at 74. According to the EEOC's decision, Fuller didn't provide testimony or evidence for the investigation. *See* [76] ¶ 69; [64-3] at 64. Plaintiff filed this lawsuit in February 2019. [1]. On April 22, 2019, the EEOC sent Fuller a right-to-sue letter along with its final decision. *See* [64-3] at 75.

---

[20] That Fuller's letter offered different reasons for her refusal to sign the last chance agreement than those that Fuller expressed in person to the chief nursing officer doesn't controvert what Fuller said she told the chief nursing officer: that she refused to sign unless the agency removed the EEO waiver requirement. *See* [82] ¶ 19.

### III. Analysis

At issue here are Fuller's claims for discrimination and retaliation under the Rehabilitation Act and for retaliation under Title VII. *See* [1] ¶¶ 35–54, 62–75.[21] The VA moves for summary judgment on all of Fuller's claims. *See* [62].[22] Fuller seeks summary judgment only as to her retaliation claims. *See* [71].

### A. Failure to Accommodate

Under the Rehabilitation Act, a federal employer must reasonably accommodate the known physical and mental disabilities of a qualified employee. *See* 29 U.S.C. § 794; *McCray v. Wilkie*, 966 F.3d 616, 620–21 (7th Cir. 2020) (citing *McWright v. Alexander*, 982 F.2d 222, 225 (7th Cir. 1992)). The standards for discrimination under the Rehabilitation Act are the same as under the Americans with Disabilities Act. *See* 29 U.S.C. § 794(d); *McCray*, 966 F.3d at 621 (citations omitted). To show that the VA failed to reasonably accommodate her, Fuller must prove that (1) she was a qualified individual with a disability; (2) the VA was aware

---

[21] Fuller conceded her claims for discrimination under the ADEA and Title VII. [77] at 3 n.2. Fuller's briefing only addresses two theories of discrimination under the Rehabilitation Act: failure to accommodate and failure to engage in the interactive process. *See* [77] at 12–14. Fuller has forfeited argument as to any harassment theory. *See Salas v. Wisconsin Dep't of Corr.*, 493 F.3d 913, 924 (7th Cir. 2007) (citing *Witte v. Wisconsin Dep't of Corr.*, 434 F.3d 1031, 1038 (7th Cir. 2006)) (a nonmovant forfeits arguments she fails to raise in a brief opposing summary judgment).

[22] The VA argues that all of Fuller's claims should be dismissed because she didn't comply with the EEOC's investigation. *See* [63] at 37. Exhaustion of administrative remedies presupposes cooperation with authorized requirements. *See Reynolds v. Tangherlini*, 737 F.3d 1093, 1099 (7th Cir. 2013). But a plaintiff exhausts her administrative remedies when she receives a right-to-sue letter. *See Hill v. Potter*, 352 F.3d 1142, 1145 (7th Cir. 2003) (citations omitted). Fuller received a right-to-sue letter in this case, *see* [64-3] at 75, and so she met the exhaustion requirement.

of her disability; and (3) the VA failed to reasonably accommodate her. *See Connors v. Wilkie*, 984 F.3d 1255, 1260–61 (7th Cir. 2021) (citing *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019)).

There's no dispute that Fuller was qualified (meaning that she could perform the essential functions of her job, *see* 42 U.S.C. § 12111(8)), and that the VA was aware of her alleged disability. *See* [63] at 28–32. The VA argues that Fuller wasn't disabled and, alternatively, that the VA didn't fail to reasonably accommodate plaintiff because (1) Fuller didn't make a reasonable request; (2) plaintiff hasn't shown that a vacant position was available when she requested her transfer; and (3) the agency provided a reasonable accommodation by transferring Fuller to a different part of the medical center. *See id.*

Fuller was disabled if she had (1) a physical or mental impairment that substantially limited one or more major life activities; (2) a record of such impairment; or (3) was regarded as having such an impairment. *See* 42 U.S.C. § 12102(1); *Carothers v. Cnty. of Cook*, 808 F.3d 1140, 1147 (7th Cir. 2015).[23] Fuller argues that her mental impairments—anxiety and depression—substantially limited her abilities to sleep, concentrate, and work. [77] at 12–14; *see* 42 U.S.C. § 12102(2)(A); *Feldman v. Olin Corp.*, 692 F.3d 748, 753–54 (7th Cir. 2012) (sleeping is a major life activity); *Emerson v. N. States Power Co.*, 256 F.3d 506, 511 (7th Cir.

---

[23] Amendments to the ADA direct that the "definition of disability ... be construed in favor of broad coverage," 42 U.S.C. § 12102(4)(A), but that instruction applies specifically to the third prong of the definition: whether a person was regarded as having an impairment that substantially limited one or more major life activities. *See Richardson v. Chicago Transit Auth.*, 926 F.3d 881, 888 (7th Cir. 2019) (citing *Miller v. Illinois Dep't of Transp.*, 643 F.3d 190, 196 (7th Cir. 2011)).

2001) (declining to decide whether concentrating is a major life activity and instead treating it as an activity that "feed[s] into the major life activities of learning and working"); *Carothers*, 808 F.3d at 1147 (working is a major life activity).

To claim disability on the basis of sleep problems, Fuller needs to show that those problems are "sufficiently 'prolonged, severe and long-term' to warrant classification as a disability." *Feldman*, 692 F.3d at 753–54 (quoting *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 784 (7th Cir. 2007)). Generalized assertions of an inability to sleep for substantial periods of time, without evidence or claims that lack of sleep affects daytime functioning, aren't enough. *See id.* Here, Fuller told her psychologist that she had difficulty sleeping and had been prescribed a medication to help her sleep, *see* [76-3] at 541; [81] ¶ 48, but those generalized allegations don't show that Fuller's lack of sleep affected her daytime functions. Fuller hasn't shown that her insomnia was so prolonged, severe, and long-term as to count as a disability under the Rehabilitation Act. *See Feldman*, 692 F.3d at 753–54.

Fuller told her psychologist that she was having trouble concentrating "half the days over the past two weeks." [76-3] at 541; *see* [81] ¶ 48. Even assuming that concentrating is a major life activity, *see Emerson*, 256 F.3d at 511 (declining to decide whether concentrating is a major life activity), Fuller hasn't shown that her anxiety and depression substantially impaired her in this area, because Fuller's concentration problems were short-term and intermittent. *See Ogborn v. United Food & Com. Workers Union, Loc. No. 881*, 305 F.3d 763, 767 (7th Cir. 2002) (an impairment that limited a major life activity for only a short period of time wasn't a

substantial limitation under the ADA); 29 C.F.R. § 1630.2(j)(4) (the duration, nature, and severity of an impairment is relevant to whether an impairment is substantially limiting).

Fuller argues that her anxiety and depression substantially limited her ability to work. *See* [77] at 13. A person is substantially limited in the major life activity of working if she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Powers v. USF Holland, Inc.*, 667 F.3d 815, 820 (7th Cir. 2011) (quoting 29 C.F.R. § 1630.2(j)(3)(l)); *see Carothers v. Cnty. of Cook*, 808 F.3d 1140, 1147 (7th Cir. 2015). Similarly, it's not enough for Fuller to allege that she couldn't perform her job under specific supervisors, because if she could do the "same job for another supervisor, she can do the job, and does not qualify" as disabled. *Schneiker v. Fortis Ins. Co.*, 200 F.3d 1055, 1062 (7th Cir. 2000) (quoting *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 525 (7th Cir. 1996)).

There's no evidence that Fuller was unable to work in a class or broad range of jobs as a result of her depression and anxiety. Instead, the record shows that Fuller's limitations in her ability to work were tied to her supervisors. Fuller's doctor found that she wasn't impaired in any specific activities, just that she was unable to work in her current work environment. *See* [76-3] at 4–5; [76] ¶ 57; [81] ¶ 29. His recommendation was that Fuller be transferred to a different department at the VA (he recommended that she be removed from the "nursing service department"), not that she stop working as a nurse. *See* [76-3] at 4–5; [76] ¶ 57; [81] ¶ 29. Attempting

19

to explain what her limitations were, Fuller told the VA's accommodations team that she had a problem with Beatty, Goshay, and another supervisor. [76] ¶ 62. Fuller told another doctor that she was experiencing "acute stress" because her superiors at work were purposefully mistreating her. [76-3] at 546; [81] ¶ 48.

Whether Fuller's supervisors caused her conditions, *see* [77] at 13, isn't relevant: the question here is whether Fuller could perform her job under different circumstances. *See Schneiker*, 200 F.3d at 1062 (citing *Weiler*, 101 F.3d at 524–25) ("[A] personality conflict between an employee and a supervisor—even one that triggers the employee's depression—is not enough to establish that the employee is disabled, so long as the employee could still perform the job under a different supervisor."); *Carothers*, 808 F.3d at 1147 (citing 29 C.F.R. § 1630 Appendix) (substantial limitations in performing unique aspects of a single specific job aren't sufficient to show a substantial limitation in the activity of working). In this case, Fuller's limitations on her ability to work were specific to her current environment and to particular individuals.

Fuller hasn't shown that she was substantially limited in her ability to perform a major life activity, or otherwise demonstrated that she was disabled. *See* 42 U.S.C. § 12102(1); *Carothers*, 808 F.3d at 1147. Her failure to accommodate claim has other problems, too. As discussed above, Fuller requested (and her doctor recommended) that as an accommodation for her disabilities she be moved away from certain employees. *See* [77] at 13–14; [64-2] at 299 (Fuller asked to be "Detailed out of nursing service."). Reassignment to a vacant position can be a reasonable accommodation. *See*

20

*Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 482 (7th Cir. 2017) (citing 42 U.S.C. § 12111(9)(B)). As discussed above, however, Fuller's request to be transferred was specific to Fuller's current environment (and to Fuller's supervisors who were causing her stress), and that kind of request for a transfer isn't reasonable. *See Weiler v. Household Fin. Corp.*, 101 F.3d 519, 526 (7th Cir. 1996) (quoting *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996)) (the ADA doesn't require an employer to transfer an employee to work for a different supervisor).

Even if Fuller's request had been reasonable, she hasn't shown that the VA failed to reasonably accommodate her. A reasonable accommodation is a modification to the work environment or to the way in which work is performed that allows a qualified individual with a disability to perform the essential functions of her job. *See* 29 C.F.R. § 1630.2(o)(1)(ii); *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 682 (7th Cir. 2014). Fuller began the accommodations process with the VA in September 2016, but there's no evidence as to what accommodation she requested of the agency at that time, or that she submitted the requested medical documentation that would have allowed the VA to identify a reasonable accommodation. *See* [76-3] at 536–37; [81] ¶ 48.[24] Fuller submitted a written request for an accommodation (backed by her doctor's recommendation) nearly a year later—in August 2017—asking the VA to transfer her out of nursing service. *See* [76] ¶¶ 56–57; [76-3] at 4–5; [81] ¶ 29. While officials at the agency weren't sure what accommodation Fuller needed, if any, the

---

[24] An employer may reasonably request medical support to determine necessary accommodations and deny a request if the employee does not produce it. *See Brown v. Milwaukee Bd. of School Directors*, 855 F.3d 818, 821 (7th Cir. 2017) (citations omitted).

21

VA nonetheless transferred Fuller to volunteer services in September 2017. *See* [76] ¶¶ 58–59, 61–62, 64; [81] ¶ 60.

Plaintiff argues that because volunteer services was still a part of the nursing service and the transfer was temporary, the move wasn't a reasonable accommodation. [77] at 14.[25] Although the VA didn't move Fuller out of nursing service as she had asked, *see* [81] ¶ 72; [76-2] at 568, Dep. at 161, the agency wasn't required to give Fuller the precise accommodation she wanted. *See Williams v. Bd. of Educ. of City of Chicago*, 982 F.3d 495, 504 (7th Cir. 2020) (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 802 (7th Cir. 2005)). The transfer allowed Fuller to keep working and alleviated her distress, *see* [64-3] at 46, 51; [76] ¶ 66, and Fuller hasn't shown that she was unable to perform the essential functions of her job after being transferred. *See* 29 C.F.R. § 1630.2(o)(1)(ii); *Bunn*, 753 F.3d at 682. That the move to volunteer services was temporary and that the agency continued to discuss other potential accommodations doesn't make the VA's accommodation unreasonable, either.[26] The VA was allowed to choose a reasonable accommodation. The agency did that here.[27]

---

[25] Fuller also argues that because the transfer was a response to her misconduct, rather than intended to reasonably accommodate her, the transfer wasn't a reasonable accommodation. [77] at 14. But there's no evidence that the transfer wasn't related to Fuller's accommodation request. *See* [81] ¶ 72; [76-3] at 277–78.

[26] From these continuing discussions it's not reasonable to infer (as plaintiff asserts) that the VA knew that it had failed to reasonably accommodate Fuller. *See* [81] ¶ 73; [76] ¶ 62; [76-3] at 610; [64-3] at 45–46.

[27] Even if the transfer to volunteer services wasn't reasonable, Fuller hasn't shown that some other vacancy at the VA existed. While an employer may be required to reassign an employee, that duty applies only to vacant positions, and Fuller bears the burden of demonstrating that a vacant position was available. *See Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 856–

22

Fuller hasn't shown that she was disabled or that the VA failed to reasonably accommodate her. The record shows that the agency considered Fuller's request and reasonably accommodated her by moving Fuller to a different part of the medical center. Defendant's motion is granted as to the failure to accommodate claim.

## B.    Retaliation

Fuller has three theories as to how the agency retaliated against her. *See* [77] at 4–12; [72] at 5–14. First, Fuller argues that the agency issued Fuller a reprimand and skipped a step in the agency's progressive discipline policy because Fuller complained about sexual harassment—Title VII retaliation. [77] at 6–8. Second, plaintiff claims that the VA retaliated under the Rehabilitation Act when it ended Fuller's reasonable accommodation process and proposed Fuller's termination after she requested an accommodation. *Id.* at 8–10. Third and finally, Fuller argues that the VA fired her (in violation of the anti-retaliation provisions of both Title VII and the Rehabilitation Act) because she refused to sign the agency's last chance agreement and waive certain rights. *Id.* at 10–12; [72] at 5–12.

Title VII and the Rehabilitation Act include similar prohibitions on retaliation. *See* 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 794(d) (the Rehabilitation Act incorporates ADA standards, *see* 42 U.S.C. § 12203); *Twisdale v. Snow*, 325 F.3d 950, 952 (7th Cir.

---

57 (7th Cir. 2015) (citations omitted); *Rehling v. City of Chicago*, 207 F.3d 1009, 1014–15 (7th Cir. 2000). Fuller argues that she wasn't in a position to discover vacancies at the VA because the agency (not the employee) was supposed to look for potential openings. *See* [77] at 13–14. But while the VA's handbook may have prevented her from identifying a vacancy when she was still employed with the agency, the discovery process in this litigation was Fuller's opportunity to find out whether a vacancy existed. Without evidence of vacant positions, Fuller can't succeed on this theory for her claim.

2003) (the retaliation provisions of Title VII and the Rehabilitation Act are "materially identical"). The key question here is whether Fuller's statutorily protected activity caused the VA to take an adverse action against her. *See Rowlands v. United Parcel Serv. - Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018) (applying the ADA and citing *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764 (7th Cir. 2016)); *Miller v. Chicago Transit Auth.*, 20 F.4th 1148, 1155 (7th Cir. 2021) (Title VII). One way to prove retaliation under either Title VII or the Rehabilitation Act is the burden-shifting framework created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ortiz*, 834 F.3d at 765–66; *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 759 (7th Cir. 2006)). Under any approach, however, I evaluate all of the evidence as a whole. *See Ortiz*, 834 F.3d at 765.

### 1.    *Complaints About Harassment*

Fuller argues that her complaints about Saulsberry's sexual harassment were protected activity under Title VII. [77] at 6. Fuller's union representative said that she and Fuller filed a complaint with HR between February and April 2017. *See* [81] ¶ 3; [76-2] at 541–42, Dep. at 52–57. Fuller said that in September or fall of 2017 she told her union representative about the comments and reported Saulsberry's conduct to the nurse executive, HR, an EEO counselor, and the medical center's associate director. [76] ¶¶ 5, 48; [64-2] at 18–19, 27–28, Dep. at 64–69, 100–102; *see* [81] ¶ 3. The union representative forwarded Fuller's report about the comments to the medical center's HR department in September 2017. [76] ¶ 49.

24

With the exception of Fuller's written report, it's not clear what precisely Fuller complained of to her superiors and to HR. But given the nature of Saulsberry's comments—graphic sexual invitations with coarse references to anatomy—it's reasonable to infer that Saulsberry targeted Fuller on the basis of her sex, and that her complaints about him were thus protected activity under Title VII. *Cf. Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) (citation omitted) ("Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient.").

To succeed on her claim under Title VII, Fuller must show that the VA's actions taken in response to her complaints would have been materially adverse to a reasonable employee, such that the employee would have been deterred from making or supporting a charge of discrimination. *Robertson v. Dep't of Health Services*, 949 F.3d 371, 382 (7th Cir. 2020) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). Whether a given action is adverse depends on the circumstances of each case. *Id.* (citing *Burlington*, 548 U.S. at 71).

Fuller argues that the VA took two adverse actions: issuing her a reprimand on March 28, 2017, and skipping the next step in the agency's progressive discipline and instead proceeding directly to a proposed removal. [77] at 6–7. The reprimand, which wasn't accompanied by any tangible consequences, *see* [76] ¶ 14; [64-2] at 241–42, isn't an adverse action that can support Fuller's claim. *See Robertson*, 949 F.3d at 383 (quoting *Boss v. Castro*, 816 F.3d 910, 919 (7th Cir. 2016)) ("[U]nfair reprimands

or negative performance reviews, unaccompanied by tangible job consequences" are not enough to show adverse action for a Title VII retaliation claim). The agency's decision to skip a step in its disciplinary process didn't have real consequences for Fuller, either. *See* [64-2] at 154 (Fuller was retained in active-duty status during the notice period). Nothing in the VA handbook prohibited the agency from proceeding straight from a reprimand to a proposed removal, *see* [76-3] at 110; [81] ¶ 32, and a jury couldn't conclude that a reasonable person in Fuller's situation would have been dissuaded from engaging in protected activity as a result.

Fuller hasn't shown adverse action, and she also can't prove causation. While it's reasonable to infer that Fuller complained about sexual harassment before the VA issued her a reprimand and prepared its notice of proposed removal, timing alone is rarely sufficient to show causation. *See Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018) (citation omitted). Fuller argues that there is direct evidence of retaliation. *See* [77] at 7–8. Fuller said that her second-level supervisor, Beatty, harassed and scrutinized her because of Beatty's relationship with Saulsberry. *See* [76] ¶¶ 50–51; [81] ¶ 6.[28] But that is not the same as scrutinizing Fuller because Fuller complained about Saulsberry. The record suggests that Beatty sought to have Fuller disciplined because of jealousy and personal animosity. Title VII protects against discrimination on the basis of a protected characteristic, not other forms of workplace harassment or misbehavior. *See Tyburski v. City of Chicago*, 964 F.3d 590, 602 (7th Cir. 2020)

---

[28] Fuller's direct supervisor, Goshay, said that Goshay scrutinized Fuller because Beatty told her to. [81] ¶¶ 6–8.

(quoting *Brown v. Advocate South Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012)). Fuller's theory rests on timing alone, then: there's no other evidence of retaliatory motive.

Beatty should not have punished Fuller out of spite or animosity. But plaintiff hasn't shown that the agency took any adverse action against her because of her complaints about sexual harassment. Without that, this theory of retaliation under Title VII fails.

### 2. *Request for a Reasonable Accommodation*

It's undisputed that Fuller's request for a reasonable accommodation in summer 2017 was protected by the Rehabilitation Act. *See* [77] at 8; [80] at 7–8. Fuller argues that as a result of that request, the VA took three adverse actions against her: (1) terminating Fuller's reasonable accommodation process; (2) transferring Fuller to volunteer services instead of another area of the medical center; and (3) proposing Fuller's termination. [77] at 8. An adverse action under the Rehabilitation Act is one that would dissuade a reasonable employee from engaging in protected activity. *See Koty v. DuPage Cnty., Illinois*, 900 F.3d 515, 520 (7th Cir. 2018) (quoting *Roney v. Illinois Dep't of Transp.*, 474 F.3d 455, 461 (7th Cir. 2007)) (applying the ADA). Whether a given action is adverse depends on the circumstances of each case. *Id.* (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006)).

Ending Fuller's accommodation process and declining to transfer her to Fuller's preferred section at the medical center weren't adverse actions. Congress gave Fuller a remedy for problems with the VA's accommodation process (as

discussed above), and allowing Fuller to base her retaliation claim on the same conduct as her discrimination claim would be circular and redundant. *See Moore-Fotso v. Bd. of Educ. of the City of Chicago*, 211 F.Supp.3d 1012, 1037–38 (N.D. Ill. 2016) (collecting cases). The VA was permitted to choose a reasonable accommodation for Fuller, and the agency's decision to accommodate her in a way other than what she requested wasn't an adverse action. *See Koty*, 900 F.3d at 520 (citing *Jay v. Intermet Wagner, Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000) and *Hancock v. Potter*, 531 F.3d 474, 478–79 (7th Cir. 2008)); *Place v. Abbott Laboratories*, 215 F.3d 803, 810 (7th Cir. 2000) (citation omitted) (a change to an essentially equivalent job isn't an adverse action for the purposes of an ADA retaliation claim).

On October 18, 2017, the medical center's nurse executive gave Fuller a notice of proposed removal. [76] ¶ 39; [82] ¶¶ 4, 7; [81] ¶ 55. Assuming that the notice was a materially adverse action,[29] Fuller needs to show that her request for an accommodation caused the VA to issue her the notice. The roughly two-month gap between Fuller's request for an accommodation and the notice is some evidence of causation, but timing alone is rarely enough. *See Silk v. Bd. of Trustees, Moraine*

---

[29] Generally, written warnings, standing alone, do not constitute materially adverse actions, even for the purposes of a retaliation claim. *See Benuzzi v. Bd. of Educ. of City of Chicago*, 647 F.3d 652, 665 (7th Cir. 2011) (citations omitted). Fuller hasn't alleged that the conditions of her employment changed in any way as a result of the notice, *see* [64-2] at 154 (Fuller was retained in active-duty status during the notice period), but the challenged action doesn't need to be one that "affects the terms and conditions of employment." *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016). The notice wasn't an empty threat, and it warned of potential serious future disciplinary action. *Cf. Benuzzi*, 647 F.3d at 665.

28

*Valley Comm. College, Dist. No. 524*, 795 F.3d 698, 710 (7th Cir. 2015) (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008)).[30]

Fuller argues that comparator evidence also supports causation, because other nurses who didn't have pending reasonable accommodation requests didn't receive a notice of proposed removal. *See* [77] at 9–10. To show that she is similarly situated to other employees, Fuller needs to prove that the individuals are "directly comparable to [her] in all material respects." *Monroe v. Indiana Dep't of Transp.*, 871 F.3d 495, 507 (7th Cir. 2017) (internal citations and quotations omitted) (for similarly situated comparisons to work, there must be enough common factors to allow for a meaningful comparison to determine whether intentional discrimination explains any differences). Important points of comparison include (1) whether the employees had the same supervisor; (2) whether they were subject to the same standards; and (3) whether they had a comparable set of failings. *See id.* at 507, 509 (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008) and citing *Henry v. Jones*, 507 F.3d 558, 566 (7th Cir. 2007) and *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 751–52 (7th Cir. 2006)).

Fuller hasn't shown that she shared enough common factors with the other nurses. Fuller doesn't argue that her proposed comparators had the same supervisor, and none of the other nurses who violated the scopes procedure had a comparable set of failings because none of them had earlier disciplinary records. *See* [76] ¶ 38; *Burks*,

---

[30] Fuller told her supervisor about stress on July 19, 2017, but didn't request an accommodation until August 28, 2017. *See* [76] ¶ 53; [81] ¶ 24.

464 F.3d at 751–52 (employees who didn't have performance reviews similar to a plaintiff and didn't share in her other failings weren't similarly situated). Fuller's comparators weren't similarly situated to her, and the evidence about those employees doesn't cast doubt on the VA's reasons for issuing her the notice of proposed removal.

Viewing the evidence as a whole, no reasonable factfinder would conclude that Fuller's request for an accommodation caused the VA to issue her a notice of proposed removal. *See Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765–66 (7th Cir. 2016). Plaintiff has probably shown that she suffered an adverse action. But the only reason in the record as to why the VA took that action is Fuller's misconduct with the scopes, disputes with other employees, and unprofessional treatment of a patient. Under the Rehabilitation Act, that doesn't add up to retaliation.

### 3.    *Refusal to Sign the Last Chance Agreement*

Fuller's final theory of retaliation is that her refusal to sign the VA's last chance agreement (and to waive rights guaranteed by Title VII and the Rehabilitation Act) was a form of protected activity. *See* [72] at 5–12; [77] at 10–12; *E.E.O.C. v. Cognis Corp.*, No. 10-CV-2182, 2012 WL 1893725 (C.D. Ill. May 23, 2012). Because Fuller's refusal to sign resulted in her termination, Fuller says that the agency retaliated against her. *See* [72] at 5–12; [77] at 10–12.

Fuller claims that the last chance agreement was facially retaliatory. *See* [72] at 10–11. According to the agreement, the VA promised to "hold the penalty of

removal in abeyance" for two years. *See* [73-2] at 128–30; [82] ¶ 17. In exchange, Fuller was required to

> waiv[e] all appeal and grievance rights arising from this agreement or any other violation of the terms of this agreement including, but not limited to, the use of the Equal Employment Opportunity discrimination complaints procedure, use of the negotiated grievance/arbitration procedure, use of the Merit Systems Protection Board procedure, and civil court appeal.

[73-2] at 128–29; *see* [82] ¶ 17; [81] ¶ 66. Fuller also had to recognize that "this agreement is a final and binding resolution to her removal from employment" with the medical center, [73-2] at 129; [82] ¶ 17; [81] ¶ 66, and promise to "voluntarily withdraw any other action, proceeding, complaint, etc., which may be pending against the Agency" or its officers and employees. [73-2] at 131; [82] ¶ 17; [81] ¶ 66. According to Fuller, the agreement put her between a rock and hard place: forced to choose between signing away her rights and being fired. *See* [72] at 10–12.

The antiretaliation provisions in Title VII and the Rehabilitation Act do not explicitly prohibit threats. *See* 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 794(d). But these provisions were intended to protect access to the statutes' remedies, and certain threats of retaliation could deter reasonable workers from exercising their statutory rights. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006) (Title VII's antiretaliation provision is intended to prevent employers from interfering with employees' efforts to advance enforcement of the Act's "basic guarantees"); *Robertson v. Dep't of Health Services*, 949 F.3d 371, 382 (7th Cir. 2020) (citation omitted) (materially adverse actions for a retaliation claim are those that would deter a reasonable employee from making or supporting a charge of discrimination).

31

Making a person choose between exercising protected rights and being fired may be a prohibited threat: a form of anticipatory retaliation. *See Beckel v. Wal-mart Associates, Inc.*, 301 F.3d 621, 624 (7th Cir. 2002) (citations omitted) (suggesting in dicta that threatening an employee with termination if she filed suit under Title VII would be "actionable as retaliation"); *Johnson v. ITT Aerospace/Communications Div. of ITT Industries, Inc.*, 272 F.3d 498, 500–01 (7th Cir. 2001) (citing *Sauers v. Salt Lake Cnty.*, 1 F.3d 1122, 1128 (10th Cir. 1993)) (suggesting in dicta that an employer who "deliberately strewed unreasonable obstacles in the path of employees seeking to enforce their rights" under Title VII or other employment laws would engage in unlawful anticipatory retaliation); *Marshall v. Indiana Dep't of Corr.*, 973 F.3d 789, 793 (7th Cir. 2020).

Fuller was asked to waive certain rights as part of the VA's last chance agreement. *See* [64-2] at 291–94. Not all waivers of statutory rights are unlawful,[31] but employees cannot waive future claims. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51 (1974) ("[T]here can be no prospective waiver of an employee's rights

---

[31] For instance, an employee may waive or release a Title VII claim arising before the date of waiver, so long as the waiver is valid under state law, knowing, and voluntary. *See Hampton v. Ford Motor Co.*, 561 F.3d 709, 716 (7th Cir. 2009); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52 (1974) ("[P]resumably an employee may waive his cause of action under Title VII as part of a voluntary settlement."). An employee can also likely waive past claims under the Rehabilitation Act. *See Isbell v. Allstate Ins. Co.*, 418 F.3d 788, 793, 797 (7th Cir. 2005) (requiring that a former employer waive any past ADA claim against an employer in exchange for being re-hired was not retaliatory); *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1129 (7th Cir. 1997) ("[T]he prerogative of litigating one's Title VII and ADA claims in federal court is the type of important right the relinquishment of which requires a knowing and voluntary waiver."); *E.E.O.C. v. Allstate Ins. Co.*, 778 F.3d 444, 449 (3d. Cir. 2015) (citations omitted) ("Title VII and ADA claims are ... subject to waiver by terminated employees.").

under Title VII."); *Riley v. American Family Mut. Ins. Co.*, 881 F.2d 368, 371 n.6 (7th Cir. 1989). The VA's waiver was unenforceable, then, at least to the extent that it required Fuller to give up her appeal and grievance rights for federal claims against the agency that hadn't yet materialized. *See* [64-2] at 291–94.

The VA offered Fuller an overbroad waiver in the context of a last chance agreement. But that's not the kind of impermissible threat that counts as a form of retaliation. *See Beckel*, 301 F.3d at 624; *Johnson*, 272 F.3d at 500–01. The agreement did not promise that Fuller would be fired if she refused to waive or later exercised her rights. *See* [64-2] at 291–94.[32] It's true that Fuller's termination was the implied alternative: Fuller was given the choice between the agreement and being fired. *See* [64-2] at 286–89, 291–94. But neither the agreement nor the VA's employees told Fuller that she had to accept the *agency's waiver* to avoid termination. In other words, Fuller's theory of a threat in this case doesn't work, because there's no clear causal link between any proposed protected activity (refusing to sign the waiver or attempting to exercise her rights) and the retaliatory action (Fuller's termination). *Cf. Beckel*, 301 F.3d at 624 (threatening an employee with termination if she sued might be a form of retaliation).

If offering the agreement had been a clearer threat—sign the agreement (and be bound by its overbroad waiver) or else you will be fired—that might have been an

---

[32] According to the agreement, Fuller could be terminated for breaching several provisions, but the waiver requirements were not among them. *See* [64-2] at 291, ¶ 3(e). The agreement would have required the agency to hold the penalty of removal in abeyance for two years in exchange for Fuller's promises, including her waiver. *See id.* at 291, ¶ 2.

unlawful employment practice. *See Beckel*, 301 F.3d at 624; *Johnson*, 272 F.3d at 500–01. Plaintiff opposed the agency's offer. Fuller delivered a letter to the agency, rejecting the agreement because (1) she refused to waive her right to "prosecute any existing or future claims against the Agency" or her right to use EEO complaints procedures; and (2) the agreement didn't guarantee that Fuller would be treated the same as other employees as to discipline or termination. [64-2] at 296–97; *see* [76] ¶ 43; [82] ¶ 18; [81] ¶ 67. Fuller also told a superior that she would not sign unless the agency removed the requirement that Fuller waive her EEO rights. *See* [76] ¶ 4; [81] ¶ 68; [82] ¶ 19; [76-2] at 164–65, ¶ 4. Because I find that the agency's agreement wasn't an unlawful employment practice—it wasn't a threat to fire an employee for refusing an unlawful waiver—Fuller didn't engage in protected activity by opposing the waiver.

Even if Fuller's opposition had been protected activity, however, she would still need to show that her protected activity caused the agency to take an adverse action. *See Rowlands v. United Parcel Serv. - Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018) (applying the ADA); *Miller v. Chicago Transit Auth.*, 20 F.4th 1148, 1155 (7th Cir. 2021) (Title VII).[33] To make that showing, Fuller would need to prove that the VA's desire to retaliate was "*the* but-for cause of the challenged employment action," not merely a motivating factor or one of many but-for causes. *Mollet v. City of Greenfield*, 926 F.3d 894, 897 (7th Cir. 2019) (quoting *University of Texas Southwestern Med. Ctr.*

---

[33] There's no dispute that Fuller's termination was an adverse action under both Title VII and the Rehabilitation Act. *See* [80] at 8–13.

34

*v. Nassar*, 570 U.S. 338, 352 (2013)) (Title VII); *Rowlands*, 901 F.3d at 801–02 (citation omitted) (ADA); *see also Natofsky v. City of New York*, 921 F.3d 337, 346–50 (2d Cir. 2019). In other words, "proof of mixed motives will not suffice." *Hillmann v. City of Chicago*, 834 F.3d 787, 795 (7th Cir. 2016) (quoting *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010)).

The relevant facts aren't disputed. The medical center's director sent Fuller a termination letter, explaining that she was being fired for (1) failure to follow standard operating procedure related to scopes; (2) failure to carry out assigned work, causing a delay in patient care; and (3) conduct unbecoming a federal employee. *See* [76] ¶¶ 39, 42; [64-2] at 286–89; [82] ¶ 9. At the same time, Fuller received the last chance agreement. *See* [76] ¶ 42; [64-2] at 291–94. The chief nursing officer told Fuller that because she refused to execute the last chance agreement, her employment was terminated. [81] ¶ 69; [82] ¶¶ 20–21; [76] ¶ 43. According to the medical center's director, had Fuller signed the last chance agreement and complied with its terms, she would not have been terminated. [82] ¶ 15; [81] ¶ 65.

Fuller can't show causation, partly because her theory of retaliation doesn't fit with how last chance agreements work. Such agreements are probationary contracts, used when an employee faces removal or serious discipline for some other reason, like poor performance or misconduct. *See U.S. Dep't of Air Force v. Federal Labor Relations Auth.*, 949 F.2d 475, 478 (D.C. Cir. 1991); *Gibson v. Dep't of Veterans Affairs*, 160 F.3d 722, 727 (Fed. Cir. 1998) (J. Plager, concurring); *Speedy v. Rexnord Corp.*, 243 F.3d 397, 403 n.3 (7th Cir. 2001); Beth Bates Holliday, *Use of "Last*

Chance" or "Return to Work" Agreements Under Americans with Disabilities Act, 6 A.L.R. Fed. 2d 453 (2005). An employer offering an employee a last chance agreement has already made a decision to terminate the employee, as the VA did with Fuller in this case. See [64-2] at 286–89. That means that while an employee's rejection of the agreement is always going to be a cause of termination (because if the employee signed, she wouldn't be fired right then and there), the real reason for an employee's termination is unrelated to the last chance agreement: usually misconduct or poor performance. In Fuller's case, her rejection of the agreement was a cause of termination, see [82] ¶ 15; [81] ¶ 65, but the but-for cause was Fuller's misconduct. See [64-2] at 286–89; Mollet, 926 F.3d at 897.

Another problem with Fuller's causation argument is that plaintiff was fired for refusing to execute the agreement, not because she opposed the agency's waiver requirements. See [81] ¶¶ 65, 69; [82] ¶¶ 15, 20–21; [76] ¶ 43; [64-2] at 289. The act of refusal is different than Fuller's reason to refuse. This may seem like hair-splitting, but it is a consequential distinction. If Fuller had said nothing, and just declined the agreement, she would have been fired whether or not she opposed the waiver. And while Fuller didn't sign the last chance agreement in part because of her objections to waiving her rights, Fuller also refused to sign the agreement because the agency wouldn't promise that she be treated the same as other employees. [64-2] at 296–97; see [76] ¶ 43; [82] ¶ 18; [81] ¶ 67. That second reason for Fuller's refusal to sign makes it unclear if Fuller would have signed the agreement absent the waiver requirements. The timing of Fuller's termination—she was fired immediately after she objected to

36

the waiver language (and refused to sign the agreement)—is circumstantial evidence of retaliatory motive. But both the decision-makers' testimony and the agreement itself cited Fuller's misconduct as the reasons that Fuller was being terminated. *See* [64-2] at 291; [76] ¶¶ 19, 39; [82] ¶¶ 4, 7; [81] ¶ 55.[34] At most, Fuller has shown that her objections to the VA's overbroad waiver were *a* but-for cause of her termination. But that's not enough to prove retaliation. *See Mollet*, 926 F.3d at 897; *Rowlands*, 901 F.3d at 801.

The waiver in the last chance agreement was overbroad. But the agency didn't make a prohibited threat, and so Fuller's opposition to the agreement's waiver wasn't protected activity. Plaintiff hasn't shown causation, either, because she was fired for her misconduct, not for opposing the waiver. Defendant's motion for summary judgment as to Fuller's retaliation claims is granted.

---

[34] Fuller relies on *E.E.O.C. v. Cognis Corp.*, No. 10-CV-2182, 2012 WL 1893725, at *6 (C.D. Ill. May 23, 2012), to support her retaliation claim. In that case, the plaintiff was given a last chance agreement that included an explicit requirement that he waive his Title VII rights. *See id.* at *4. The court found that the waiver was a threat of retaliation prohibited by Title VII; that opposing the agreement was a form of protected activity; and that a plaintiff was fired for revoking the agreement. *Id.* at *3–5. The *Cognis* court held that the agreement clearly threatened retaliation. *Id.* But as discussed above at 33–34, I disagree—the last chance agreement here was not a prohibited threat to terminate employment if Fuller refused to waive un-waivable rights. I also disagree with the *Cognis* court's decision to assess causation by looking only at the last chance agreement—ignoring the termination decision reached by an employer before giving an employee the agreement. *See id.* at *4–5. That an employer chose to offer an employee a last chance agreement (thereby giving the employee some control over whether they stay or go) doesn't break the causal chain between the earlier termination decision and the employee's termination, should they reject a last chance agreement. *See also Isbell v. Allstate Ins. Co.*, 418 F.3d 788, 793 (7th Cir. 2005) (a plaintiff who had been terminated and refused to sign a new contract including a waiver of certain claims wasn't fired for refusing to sign the release, but for the reasons she was originally terminated).

## IV. Conclusion

Defendant's motion for summary judgment, [62], is granted. Plaintiff's motion, [71], is denied. Enter judgment and terminate civil case.

ENTER:

_____
Manish S. Shah
United States District Judge

Date:   June 24, 2022